UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LEONARD EDELSON,

     Plaintiff,

  v.

STEPHEN CHEUNG,

     Defendant.

**REPORT AND RECOMMENDATION**
20-MC-1995-ARR-SJB

**BULSARA, United States Magistrate Judge:**

FINDINGS OF FACT

  1. These Findings of Fact and Conclusions of Law resolve a dispute over the contents of a safe deposit box which Plaintiff Leonard Edelson ("Edelson") seeks to garnish following a judgment obtained against Defendant Stephen Cheung in the District of New Jersey. (Clerk's Certification of J., Civil Action No. 13-5870 (D. N.J. Aug. 5, 2020), Dkt. No. 1). The judgment was domesticated in this District on August 20, 2020.

  2. The safe deposit box contains cash and jewelry, including a Piaget watch. Stephen Cheung and his wife, Rosanna Cheung, are both listed on the account as "co-lessees." Although both Cheungs are named account holders, Stephen Cheung argues that his wife is the sole owner of the box and its contents, and therefore its contents are not subject to garnishment.

  3. Before the Court is a motion for turnover filed by Edelson. The Court conducted an evidentiary hearing on February 8, 2022. The Court now issues these Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a). To the extent there are facts cited in the Conclusions of Law, they are hereby incorporated into the

Court's Findings of Facts and vice versa.  The Court concludes Rosanna Cheung is the sole owner of the safe deposit box, and accordingly Edelson is not entitled to garnishment.  As such, the Court respectfully recommends that the motion for turnover be denied.

4.     Edelson obtained a judgment of $2,703,417.91 against Stephen Cheung in the United States District Court for the District of New Jersey on July 6, 2020.  *See* Am. Final J., Civil Action No. 13-5870 (D. N.J. July 6, 2020), Dkt. No. 326.

5.     Pursuant to  N.Y. C.P.L.R. § 5225 and Fed. R. Civ. P. 69(a)(1), Edelson moved for the turnover "of all non-exempt funds and personal property" of Stephen and Rosanna Cheung held by JP Morgan Chase Bank, N.A. ("Chase").  The motion for turnover was first briefed.  (Mem. of Law in Supp. dated Feb. 12, 2021, Dkt. No. 4-1; Mem. of Law in Opp'n dated Mar. 2, 2021, Dkt. No. 6; Reply Mem. of Law dated Mar. 12, 2021, Dkt. No. 10).

6.     Following submission of briefing and a conference with the Court, the parties were authorized to examine the contents of the safe deposit box and take photographs.  (Consent Order dated Oct. 20, 2021, Dkt. No. 16; *see also* Photographs of Safe Deposit Box ("Photographs"), Pl.'s Ex. 2).

7.     The Court determined that there were disputed issues of fact that required an evidentiary hearing to resolve.  The parties each filed a pre-hearing brief prior to an evidentiary hearing for the motion for turnover in November 2021.  (Cheung Pre-Hr'g Br. dated Nov. 22, 2021, Dkt. No. 17; Edelson Pre-Hr'g Br. dated Nov. 22, 2021 ("Edelson Pre-Hr'g Br."), Dkt. No. 19).  The hearing was held via videoconference on February 8, 2022.  (Tr. of Evidentiary Hr'g ("Tr.") dated Feb. 8, 2022, Dkt. No. 27).  The parties each submitted a post-hearing brief, appending exhibits entered into evidence at

2

the hearing. (Edelson Post-Hr'g Br. dated Mar. 29, 2022 ("Edelson Post-Hr'g Br."), Dkt. No. 29; Cheung Post-Hr'g Br. dated Mar. 29, 2022 ("Cheung Post-Hr'g Br."), Dkt. No. 30).

8. Rosanna Cheung is the wife of Stephen Cheung and resides in Queens, New York.[1] (Tr. at 8:7-12; 35:13-16).[2]

9. Over 10 years ago, Rosanna Cheung opened a safe deposit box (the "Box") at a Chase branch in Manhattan's Chinatown. (*Id.* at 9:1-4, 13-17). At the same time, she opened Chase checking and savings accounts. (*Id.* at 9:18-10:1). She made initial deposits into the checking and savings accounts, but not into the Box. (*Id.* at 10:14-20).

10. When she opened the accounts, she and Stephen Cheung were married. (*Id.* at 10:5-7). Nonetheless, Rosanna Cheung testified that she obtained separate accounts because she "wanted to keep [her] own money." (*Id.* at 10:12-13). Stephen Cheung was not aware of the Box at the time. (Tr. at 12:21-22). His name, however, does appear on certain statements for the Box. (2015 Chase Statement dated Feb. 23, 2015 ("2015 Chase Statement"), Pl.'s Ex. 5; Verification of Safe Deposit Box Inventory or Found Content dated Nov. 4, 2021 ("Verification"), Pl.'s Ex. 6).

11. At some point, Rosanna Cheung added Stephen Cheung's name to the Box account so that he could access it in an emergency, but according to her, she remained the primary account holder. (Tr. at 13:6-9 ("I said it's good to put somebody's name just

---

[1] Stephen Cheung's counsel represented at the hearing that he and Rosanna Cheung had a separation agreement but reconciled. Tr. at 61:25-62:6 (Cheung's counsel). However, counsel conceded that no arguments were being made that the Cheungs are not married. *See id.* at 62:7-21 (Cheung's counsel).

[2] Unless otherwise indicated, transcript cites refer to the testimony of Rosanna Cheung.

3

in case I'm sick or, you know, if I die or whatever. Then, you know, somebody can get access to my box."); 13:10-13; 13:23-14:9; 43:10-16). She explained the arrangement: if she was not able to visit the Box, Stephen Cheung was to give the cash in the Box to her sister. (*Id.* at 43:19-24). Stephen Cheung has never accompanied her to open the Box since his name was added to the account, and has never taken any money from the Box. (*Id.* at 14:10-17; 15:20-22). According to Rosanna Cheung, she is the "primary" account holder for the Box. (*Id.* at 13:14-16). Chase's records show that between September 2017 and December 2021, she was the only person to visit the Box. (Safe Deposit Box History dated Dec. 28, 2021, Def.'s Ex. B at 4).

12. When Rosanna Cheung first opened the Box, no rental fee was charged. (Tr. at 9:7-12; 11:20-22). At some point, Chase began charging a fee, which she believes is currently either $75 or $95 a year. (*Id.* at 11:23-12:10). Rosanna Cheung has paid the rental fee each year. (*Id.* at 12:13-16). A Chase savings account in Rosanna Cheung's name shows a deduction of $97.99 for annual rent for the safe deposit box. (Savings Summary, attached as Ex. 3 to Affirmation of Harvey S. Mars dated Mar. 29, 2022 ("Mars Affirmation"), Dkt. No. 30-1).[3] Stephen Cheung has never paid the rental fee. (Tr. at 12:17-19).

13. Chase's account Verification lists Rosanna Cheung as a lessee and Stephen Cheung as a co-lessee of the Box. The Verification contains the Social Security number of Rosanna Cheung, but the number is listed under Stephen Cheung's name. (*Id.*; Tr. at 40:8-15; *see also* Tax Return dated May 30, 2018 ("Tax Return"), attached as Ex. 4 to

---

[3] This document, along with the Tax Return and Invoices, *see infra* at FOF ¶ 13, was submitted after the hearing. Neither party has objected to the submission of documents either before or after the hearing for the Court's consideration.

4

Mars Affirmation at 1 (showing last four digits of Rosanna Cheung's Social Security number)). The account statements do not indicate a "primary" or "secondary" account holder. (Verification; 2015 Chase Statement). Stephen Cheung's name appears on the 2015 statement for the account, but only Rosanna Cheung's name is on the invoices from 2016 to 2019. (*Id.*; Safe Deposit Box Annual Rental Invoices ("Invoices"), attached as Ex. 2 to Mars Affirmation at 5, 8, 11, 14).

14. Around 2006, Rosanna Cheung's father and mother moved to Canada and obtained cash and jewelry from her maternal great-aunt. (Tr. at 10:23-25; 11:13-16; 22:17-23). Rosanna Cheung's parents filled out a customs statement declaring the property they brought with them. (*Id.* at 24:10-15; Customs Statement dated Oct. 26, 1988 ("Customs Statement"), Def.'s Ex. A). The Customs Statement lists a number of jewelry pieces, including:

   a. 24 rings;

   b. 9 earrings;

   c. 9 pendants;

   d. 8 necklaces;

   e. 6 bracelets;

   f. 5 pendant necklaces;

   g. 4 watches;

   h. 3 brooches;

   i. 3 clips; and

   j. 1 each of a necklace with an earring, memorial gold coin set, gold foil, scissors, cufflink clasp, nugget, keychain, gold coin, and gold bullion.

5

(*Id.* at 5–8 (the "Jewelry")). A watch described as "1 pc. 'PIAGET' Ladies Diamond Watch No. 90405" was one of the items declared. (*Id.* at 6; Tr. at 25:4-9; 33:9-12; 33:24-25; 48:8-11 (the "Watch")).[4]

15.     The Jewelry and cash were distributed among Rosanna Cheung's siblings and given to her following her mother's visit to the United States. (*Id.* at 11:7-11). Her mother gave her $35,000, which she placed in the Box. (*Id.* at 14:22-23; 15:5-12). She also gave her the Jewelry and the Watch, consistent with her great-aunt's wishes. (*Id.* at 22:23-23:3; 23:5-8).

16.     According to Rosanna Cheung, the Watch was "part of the whole group of jewelry" she acquired from her mother. (*Id.* at 22:2-4). She wore the Watch one time when she first acquired it. (*Id.* at 22:5-7). Stephen Cheung never had the Watch, according to Rosanna, because it is a ladies' watch. (Tr. at 35:3-6).[5]

17.     Rosanna Cheung has taken cash from the Box to provide for family members when they visit New York. She described the purpose of the cash as follows: "[T]he cash in there was my mother's, [given] to us so that when my siblings come to visit then we can spend that money on them so none of the siblings would need to pay

---

[4] Edelson attempts to argue that the document is inauthentic or incomplete, *see* Edelson Post-Hr'g Br. at 4, based on the notation "P.1" on the document, which he says means this list "is not part of the original document [*i.e.*, the Customs Statement]." Edelson has misread the document. P.1 refers to the fact that is the first of three pages of the itemized list of the Jewelry. *See* Customs Statement at 6–8. On P.3, there is a sum total provided for the value of the items listed on the pages: $64,153. And that is the exact amount listed on the very first page of the customs form, which references an "attached list" and which Edelson argues is a different document. It is quite clearly not.

[5] After Rosanna Cheung's testimony concluded, Edelson began to testify as to whether the Watch "is a men's watch or a woman's watch," and the Court prohibited such expert testimony from a lay, interested witness. Tr. at 56:3-59:11. The purported gender of the Watch plays no role in the Court's analysis of ownership.

6

from their pocket for all the expenses or whatever when they come to New York." (*Id.* at 14:23-15:1). She has sisters who live in Vancouver, Hong Kong, and Baltimore. (*Id.* at 54:7-10). She explained that she placed the cash in a safe deposit box instead of a bank account because the money is intended for use by her family, and not her own money. (*Id.* at 15:13-19; 42:2-11). At some point, she also asked the bank to exchange many of the original bills, most of were in denominations of $100, after the $100 bill was redesigned, out of concern that the bills would expire after a certain date. (*Id.* at 47:9-48:7).

18. Rosanna Cheung never has given any of the cash put in the safe deposit box to Stephen Cheung. (*Id.* at 51:23-25). She has taken money from the safe deposit box "a few times" when her family visited, usually around $5,000. (Tr. at 52:8-10; 53:13-14). For example, she visited the safe deposit box on September 3, 2017; August 18, 2018; and December 14, 2019. (*Id.* at 53:2-6; 53:20-23; 54:2-4). On each occasion, Rosanna Cheung took money out because family was visiting. (*Id.* at 52:8-10; 53:7-9; 53:20-24; 54:2-6).

19. When the Box was opened prior to the hearing, it contained approximately $20,000 in cash, split between two envelopes. (*Id.* at 42:25-43:2; Photographs at 11–13). The Box also contained the Jewelry, the Watch, and several unidentified items. (*Id.* at 1–10).

## CONCLUSIONS OF LAW

1. "A motion to enforce a money judgment is governed by Rule 69(a), which provides that 'proceedings supplementary to and in aid of judgment or execution . . . must accord with the procedure of the state where the court is located.'" *CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 468 (2d Cir. 2018). The relevant New

7

York statute "enables a judgment creditor to commence a 'special proceeding' against a third party who 'is in possession or custody of money or other personal property' in which the judgment debtor has an interest." *Id.* (quoting N.Y. C.P.L.R. § 5225(b)). In federal court, there is no such thing as a "special proceeding," *id.* at 469, and parties may seek relief under section 5225 through ordinary motion practice pursuant to Rule 69. *Id.* at 469–70.

2. And such a motion is treated like a summary judgment motion. *Cortes v. Juquila Mexican Cuisine Corp.*, No. 17-CV-3942, 2022 WL 970726, at *5 (E.D.N.Y. Mar. 31, 2022) (collecting cases). Accordingly, "a court may grant summary relief where there are no questions of fact, but it must conduct a trial on disputed issues of fact on adverse claims in a turnover matter." *CSX Transp., Inc.*, 879 F.3d at 473 (quotations omitted) (collecting cases). Here, the Court concluded that a disputed issue of fact was present—whether the Box was subject to a joint tenancy or whether it was exclusively Rosanna Cheung's property—and conducted a hearing to resolve that issue.

3. Section 5225(b) provides for a "two-step analysis in determining whether property belonging to a judgment debtor—but in the possession of a third party—should be turned over to a judgment creditor." *Beauvais v. Allegiance Sec., Inc.*, 942 F.2d 838, 840 (2d Cir. 1991). "First, it must be shown that the judgment debtor 'has an interest' in the property the creditor seeks to reach." *Id.* "[S]econd, then make one of two findings: it must find either that the judgment debtor is 'entitled to the possession of such property,' *or* it must find that 'the judgment creditor's rights to the property are superior' to those of the party in whose possession it is." *Id.*; *see also DeFlora Lake Dev. Assocs., Inc. v. Hyde Park*, 689 F. App'x 93, 95 (2d Cir. 2017).

8

4.     The first prong of the analysis resolves the case.  Edelson has failed to carry his burden to show that Stephen Cheung has an interest in either the cash or the Watch Edelson is trying to obtain.

5.     Under New York Banking Law § 675(a), "[w]hen two or more persons open a bank account, making a deposit of cash, securities, or other property, a presumption of joint tenancy with right of survivorship arises."  *Matter of Najjar*, 195 A.D.3d 1483, 1485 (4th Dep't 2021) (alteration in original) (quoting *New York Cmty. Bank v. Bank of Am., N.A.*, 169 A.D.3d 35, 38 (1st Dep't 2019)).  "[W]hen one opens an account in the form of a joint account, there is a presumption that the intention of the party is to create a joint tenancy in the funds, and if one party deposits all the money she intends the other to receive a present gift of one half of the property on deposit." *F.D.I.C. v. Marke Painting Co.*, No. 88 Civ. 8675, 1992 WL 212372, at *2 (S.D.N.Y. Aug. 25, 1992) (quotations omitted).

6.     The presumption of a joint tenancy with right of survivorship "extends to safe deposit boxes held jointly[.]"  *New York Cmty. Bank*, 169 A.D.3d at 38 (citing *First Am. Title Ins. Co. v. Kenderian*, 157 A.D.3d 891, 892 (2d Dep't 2018) (affirming grant of petition directing bank to turn over contents of a safe deposit box following final judgment in New Jersey state court)).  If the presumption applies, "each named tenant 'is possessed of the whole of the account so as to make the account vulnerable to the levy of a money judgment by the judgment creditor of one of the joint tenants[.]'"  *Id.* (quoting *Viggiano v. Viggiano*, 136 A.D.2d 630, 630 (2d Dep't 1988)).

7.     "While there is a presumption that the parties to a joint account are each entitled to an equal share, it is well settled that the presumption is not conclusive and may be rebutted by evidence showing that the depositor established the account for

9

convenience and not with the intention of conferring a present beneficial interest[.]" *Matter of Friedman*, 104 A.D.2d 366, 367 (2d Dep't 1984) (internal citation omitted), *aff'd*, 64 N.Y.2d 743, 743 (1984). "The presumption created by Banking Law § 675 can be rebutted by providing direct proof that no joint tenancy was intended or substantial circumstantial proof that the joint account had been opened for convenience only." *Signature Bank v. HSBC Bank USA, N.A.*, 67 A.D.3d 917, 918 (2d Dep't 2009) (quotations omitted).[6] "If the presumption is rebutted, the judgment creditor's levy on the jointly owned bank account is effective only up to the actual interest of the judgment debtor in the account[.]" *Id.*

8. In evaluating whether the presumption has been rebutted, courts examine a number of indicia, none of which are dispositive, including which party: made deposits or withdrawals from the account, *Harrington v. Brunson*, 129 A.D.3d 1581, 1582 (4th Dep't 2015); considered itself the owner of the account and received statements, *In re Est. of Corcoran*, 63 A.D.3d 93, 97 (3d Dep't 2009); and had control of the safety deposit box, *New York Cmty. Bank*, 169 A.D.3d at 38.

9. The parties do not dispute that the presumption of joint tenancy applies under section 675. (Tr. at 63:4-9; Cheung Post-Hr'g Br. at 1–2; Edelson Post-Hr'g Br. at 4–5).

10. The Court concludes that Stephen Cheung has rebutted the presumption. The evidence at the hearing established that his involvement and ownership of the Box was tangential at best. Indeed, the *only* evidence at the hearing on Stephen Cheung's

---

[6] Edelson argues that *Signature Bank* requires turnover of the Box's contents because Rossana Cheung testified that some of the contents belonged to her mother. Edelson Post-Hr'g Br. at 8. This is a nonsensical and untenable reading of the case.

10

relationship to the Box are the account statements that list his name. That is a sufficient basis to invoke the presumption, but certainly not enough to overcome the evidence rebutting it.

11. Rosanna Cheung testified that she opened the Box account. FOF ¶ 9. When she opened it, it was for the purpose of keeping an account that was separate from her husband. *Id.* ¶ 10. Her husband was not aware of the account when it was opened. *Id.* And her husband's access was intended only to be limited, not general—only for the purposes of her incapacity, and that authority appears never to have been exercised. *Id.* ¶ 11. This testimony was unrebutted. In other words, the intent and purpose of the Box was not to create a joint tenancy, but the opposite.

12. Her practice with the Box was consistent with this purpose. She was the only one to deposit or withdraw anything from the Box. Between September 2017 and December 2021, she was the only one to visit the Box; Stephen Cheung never did. *Id.* ¶ 11. And she was the only one to pay the regular fees associated with the Box. *Id.* ¶ 12.

13. The contents of the Box appear also not to have anything to do with Stephen Cheung. There is no evidence to tie him as the source of any of the items in the Box. Nor did he use anything in the Box. Rosanna testified that she gave the cash to her family members, primarily her sisters, when they visited. FOF ¶¶ 17–18. And while Stephen could have received some indirect benefit from aiding his in-laws, the Box was used exclusively to assist Rosanna's direct relatives. Indeed, had the contents been meant to assist Stephen, Rosanna would not have instructed him, as she did, to give the contents to her sister upon any disability or her death. *Id.* ¶ 11.

14. The account statements do little to change the conclusion. The statements do list Stephen Cheung, *id.* ¶ 13, but there was unrebutted testimony that he was on the

11

account for emergency purposes, *id.* ¶ 11. The statements themselves suggest control remained with Rosanna Cheung even after he was added to the account; her social security number, not his, was used on the Verification document provided by Case. *Id.* ¶ 13; *see Fragetti v. Fragetti*, 262 A.D.2d 527, 528 (2d Dep't 1999) ("[T]he parents of the defendant wife were the sole source of the funds in the joint accounts, the interest earned on the account was reported under the parents' Social Security numbers and not the defendant's, the defendant's name was added to the account as a convenience in the event of the parents' illness or disability, and the defendant made no deposits or withdrawals on her own behalf. As a result, the trial court properly found that the wife rebutted the presumption of ownership of the funds[.]").

15. This purpose and conduct are sufficient for the Court to conclude that the presumption has been rebutted. *Walsh v. Keenan*, 293 N.Y. 573, 579 (1944) ("[T]he evidence as to complete and uncontested dominion exercised by the deceased over these accounts, in which she deposited her own funds prior to her death, destroyed the statutory presumption[.]"). Stephen Cheung has no interest in the Box. A party that never withdraws or deposits funds has been found not to have a joint tenancy. *Harrington*, 129 A.D.3d at 1582 (finding presumption rebutted where defendant was the "the sole depositor of the joint accounts, and . . . plaintiff never withdrew funds from the joint accounts during [defendant's] lifetime"); *In re Yaros*, 90 A.D.3d 1063, 1064 (2d Dep't 2011) (holding no intention to create joint tenancy existed where decedent was the account's sole depositor and decedent's daughter "never made any withdrawals from the account"); *Matter of Est. of Boyd*, 186 A.D.2d 394, 394–95 (1st Dep't 1992) (ruling presumption rebutted where a single party was the sole source of the funds in the account). Nor is a party who only has limited, emergency access considered a joint

tenant. *Viggiano*, 136 A.D.2d at 631 (finding presumption rebutted when the defendant's name was added "as a convenience in the event of the mother's illness or disability[,]" which "showed an intention to create a convenience account and not to give the defendant husband any interest in the account").

16. If that were not enough, Edelson's concessions regarding the Jewelry also compel the conclusion that Stephen Cheung was not a joint tenant. Edelson has conceded that the various items, including the Jewelry, in the Box besides the cash and the Watch belong to Rosanna Cheung. (Edelson Pre-Hr'g Br. at 1; Tr. at 24:20-23 (Edelson's counsel)). The most straightforward conclusion to draw from the fact that the overwhelming majority of the items in the Box belong to Rosanna Cheung is that the two remaining items—the cash and the Watch—also belong to her.

17. Edelson's Post-Hearing Brief implies only documentary evidence qualifies as direct evidence and the Court should not rule in favor of Stephen based on Rosanna's testimony. (Edelson Post-Hr'g Br. at 6–7). Not so. The Court of Appeals long ago explained that the presumption may be rebutted by "competent evidence . . . that no joint tenancy was originally intended or created." *In re Porianda's Est.*, 256 N.Y. 423, 426 (1931). Testimony from a percipient witness has always been considered competent and direct evidence, even if from an interested witness, and sufficient to rebut the presumption. *E.g.*, *Phillips v. Phillips*, 70 A.D.2d 30, 38 (2d Dep't 1979) ("[T]he circumstances clearly support the conclusion that the joint account, made up of the defendant's money, remained the defendant's money, *and that the defendant's testimony that the account was opened without the intent of making a gift of one half of the account to the plaintiff could be fairly credited.*") (emphasis added). In any event, direct evidence is sufficient but not necessary, since the presumption may be

13

rebutted through "substantial circumstantial proof" that the account was only opened for convenience. *Signature Bank,* 67 A.D.3d at 918. There is no rule of evidence or substantive banking law provision that provides that documentary evidence is to be accorded more or less weight than testimonial evidence.

18. There is nothing to suggest that Rosanna Cheung was not credible or that her testimony is not entitled to the significant weight the Court accords it. Counsel finds her explanation for the opening of the Box unworthy of belief and is skeptical of why she did not deposit the items in a banking or savings account. Counsel's skepticism is unjustified. For one thing, the Box holds the Jewelry—which Edelson does not dispute belongs exclusively to Rosanna Cheung—and it would make sense for her to deposit other items that also belong exclusively to her. As to not depositing the money in a banking or savings account, there is nothing to suggest it would have been more or less beneficial to do so, and there was certainly nothing legally impermissible for her to elect to place the cash in the Box. And her exclusive use of the cash for her family members, which is consistent with her explanation for why she opened the Box, suggests that this testimony is worthy of belief, not lacking in truthfulness.[7]

19. In addition to arguing that Rosanna's Cheung's testimony alone is insufficient, Edelson contends that Stephen Cheung's failure to testify makes it impossible to rebut the presumption. Indeed, he asks the Court to draw an adverse

---

[7] Edelson also voices skepticism as to Rosanna Cheung's explanation for asking Chase Bank to swap out the original $100 bills for redesigned bills. Edelson Post-Hr'g Br. at 7–8. Rosanna Cheung stated how in Hong Kong, her place of birth, banknotes do in fact expire. Tr. at 48:1-7. Given this testimony, it was reasonable for her to assume that the older $100 bills would expire in the United States and to ask the bank to exchange them. But even if the fear was unfounded, it has no bearing on the issues to be decided.

14

inference. (Edelson Post-Hr'g Br. at 8). This is a curious and untenable position for two separate reasons. *First*, Edelson's counsel told the Court that Edelson did not subpoena Stephen Cheung to testify because, based on his deposition, "his testimony would be substantially similar to Mrs. Cheung's." (Tr. at 66:12-15 (Edelson's counsel)). As such, any testimony would have been duplicative, cumulative, or both, and certainly would not have favored Edelson. And so it would be an inapposite remedy to reward Edelson by granting him the benefit of an adverse inference, when had Stephen Cheung testified, the testimony would have favored Cheung, not Edelson. *Second*, nothing requires Stephen Cheung to testify to rebut the presumption. For instance, if the Banking Law provided that the debtor must testify, or if Stephen Cheung had made himself unavailable, then an adverse inference might be available. But there is no such requirement or circumstance here. And the cases Edelson cites, (Edelson Post-Hr'g Br. at 8), are merely examples of where an adverse inference has been imposed, but there must be some pre-existing requirement or circumstance that would require the debtor's testimony before the inference could be drawn.[8]

20.    Finally, Edelson argues that Stephen Cheung has not established that the Watch belongs to him. Nothing in the Banking Law suggests that the joint tenancy analysis proceeds in an item-by-item fashion, as opposed to the *account* generally. As noted, Stephen Cheung has rebutted the presumption of joint tenancy as to the Chase account, and that conclusion applies to its contents. But even on an item-by-item basis, as applied to the Watch, Stephen Cheung has rebutted the presumption of joint tenancy.

---

[8] And the cases are quite inapposite. *Cousin v. Off. of Thrift Supervision* involved an administrative law judge's review of a bribery charge. 73 F.3d 1242, 1248 (2d Cir. 1996). And *Gray v. Great Am. Recreation Ass'n, Inc.*, involved the review of a battery and assault trial. 970 F.2d 1081, 1082 (2d Cir. 1992).

15

21.     Edelson has put forth no other evidence to indicate that the Watch belongs to Stephen Cheung beyond making conclusory assertions and citing to photographs of the Watch. (*Id.*). Edelson points out that "Rosanna has conceded that [Stephen Cheung] was the owner of a watch company." (*Id.* at 9). But that general statement—from which one can infer that he owned watches—is of little consequence in the face of Rosanna Cheung's specific testimony about the Watch. The Watch is a Piaget watch. FOF ¶¶ 14, 19. A Piaget watch is listed as an item of her family's property on the Customs Statement. *Id.* ¶ 14. Rosanna Cheung explained that the Watch was brought over when her great-aunt left Asia. And she testified that her family provided her with her great-aunt's Jewelry, which is in the Box alongside the Watch, and which Edelson concedes belongs to Rosanna Cheung. *Id.* ¶¶ 14–15; Tr. at 24:20-23 (Edelson's counsel). This evidence is in stark contrast to the speculation that the Watch must belong to Stephen Cheung because he was in the watch business. The only reasonable inference to be drawn is that the Watch never belonged to Stephen Cheung, was always Rosanna Cheung's, and that the presumption of joint tenancy as to this item—to the extent such a presumption even exists—has been rebutted.

## CONCLUSION

For the reasons explained above, it is respectfully recommended that the motion for turnover be denied.

Any objections to the Report and Recommendation above must be filed with the Clerk of Court within 14 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d

Cir. 2008) ("[F]ailure to object timely to a magistrate [judge's] report operates as a waiver of any further judicial review of the magistrate [judge's] decision.") (quotations omitted).

SO ORDERED.

*/s/ Sanket J. Bulsara*  6/8/2022
SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York